# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### STATESVILLE DIVISION

| | |
|---|---|
| T. STEVEN LACKEY, SHARYN LACKEY, and J. KEITH STOKES, JR., on behalf of themselves and all others similarly situated,<br><br>      Plaintiffs,<br>      v.<br><br>HICKORY SPRINGS MANUFACTURING COMPANY, VALLE FOAM INDUSTRIES, INC., DOMFOAM INTERNATIONAL, INC., THE CARPENTER COMPANY, THE WOODBRIDGE GROUP, FLEXIBLE FOAM PRODUCTS, INC., SCOTTDEL INC., FOAMEX INNOVATIONS, INC., FUTURE FOAM, INC., VITAFOAM PRODUCTS CANADA LIMITED and VITAFOAM, INC.,<br><br>      Defendants. | **CLASS ACTION COMPLAINT** |

Plaintiffs T. Steven Lackey, Sharyn Lackey and J. Keith Stokes, Jr. ("Plaintiffs") were the sole shareholders of CFC Hiddenite Corporation ("CFC Hiddenite"), which was formerly known as Craftmaster Furniture Corporation. Plaintiffs, on behalf of themselves and all others similarly situated, bring this action for treble damages and injunctive relief, as well as attorneys' fees and costs under the antitrust laws of the United States against Defendants Hickory Springs Manufacturing Company, Valle Foam Industries, Inc., Domfoam International, Inc., The Carpenter Company, The Woodbridge Group, Flexible Foam Products, Inc., Scottdel Inc.,

Foamex Innovations, Inc., Future Foam, Inc., Vitafoam Products Canada Limited and Vitafoam Inc., and in support thereof allege as follows:

<u>**NATURE OF THE ACTION**</u>

1.      This case arises out of a conspiracy among Defendants and their co-conspirators to fix, raise, maintain and/or stabilize prices of, and to allocate customers for, polyurethane foam and polyurethane foam products ("Polyurethane Foam").  The conspiracy began at least as early as 1999 and continues to the present ("Class Period").

2.      As alleged herein, Defendants explicitly agreed with each other to charge supra-competitive prices for Polyurethane Foam.  Price increases during the Class Period were the result of conspiratorial discussions among Defendants to fix prices.  Defendants also agreed to allocate certain customers for Polyurethane Foam.

3.      As a direct and proximate result of Defendants' conspiratorial and unlawful conduct, CFC Hiddenite and the members of the Class (as defined below) have paid artificially higher prices for Polyurethane Foam than they would have otherwise paid in a competitive market, and, therefore, have suffered injury to their respective businesses and property.

4.      CFC Hiddenite, of which Plaintiffs were the sole shareholders, directly purchased Polyurethane Foam from one or more of Defendants during the Class Period.

5.      Plaintiffs bring this action, on behalf of themselves and all others similarly situated, for damages and injunctive relief under Sections 4 and 16 of the Clayton Act, 15 U.S.C §§ 15 and 26, and Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, to recover damages, the costs of suit, including reasonable attorneys' fees, injunctive relief, and for such other relief as is afforded under the laws of the United States.

2

## JURISDICTION AND VENUE

6.     This Court has subject matter jurisdiction over this dispute pursuant to 28 U.S.C. §§ 1331 and 1337 and 15 U.S.C. §§ 15 and 26.

7.     Venue is proper in this District pursuant to 28 U.S.C §§ 15, 22 and 26 and pursuant to 28 U.S.C. § 1391(b), (c) and (d).  At all times relevant to the Complaint: (a) Defendants transacted business, were found, or acted through subsidiaries or agents present in this District; (b) a substantial part of Plaintiffs' claims occurred in this District; and (c) a substantial portion of the affected interstate trade and commerce described below has been carried out in this District.

8.     This Court has *in personam* jurisdiction over each Defendant because, *inter alia*, each Defendant:  (a) committed acts in furtherance of the conspiracy alleged herein in this District and directed the unlawful conspiracy through persons and entities located in this District, including fixing the prices of Polyurethane Foam sold to purchasers in this District; (b) transacted business in Polyurethane Foam and other products in this District; (c) maintained continuous and systematic contacts with this District over a period of years; and (d) purposefully availed themselves of the benefits of doing business in this District.  Accordingly, each Defendant maintains sufficient minimum contacts with this District to be subjected to service of process in accordance with due process of law.

3

## PLAINTIFFS

9.     T. Steven Lackey, Sharyn Lackey and J. Keith Stokes, Jr. are citizens and residents of North Carolina and were the sole shareholders of CFC Hiddenite Corporation, formerly a North Carolina corporation which, prior to its liquidation in 2006, was known as Craftmaster Furniture Corporation.  During the Class Period, and prior to its 2006 liquidation, CFC Hiddenite Corporation (under its former name), purchased Polyurethane Foam directly from one or more of Defendants for use in producing furniture

10.     The prices paid by CFC Hiddenite Corporation (under its former name) for Polyurethane Foam were greater than the prices it would have paid absent the conspiracy detailed herein.  As a result, CFC Hiddenite Corporation was injured in its business and property by reason of Defendants' illegal behavior and violation of the antitrust laws.

11.     The plaintiffs named above, as the sole shareholders of the now-liquidated CFC Hiddenite Corporation, have succeeded to all claims of the now-liquidated CFC Hiddenite Corporation (f/k/a Craftmaster Furniture Corporation) for damages and other relief by reason of the conspiracy described in this Complaint, including all claims under the Sherman Act and the Clayton Act.

## DEFENDANTS

12.     Defendant Hickory Springs Manufacturing Company ("Hickory Springs") is a North Carolina corporation with its headquarters located at 235 2nd Avenue, NW, Hickory, NC 28601.  Hickory Springs is one of the largest producers of Polyurethane Foam in the United States, and is one of the nation's largest integrated component manufacturers and suppliers for

4

the furniture and bedding industries.  During the Class Period, Hickory Springs sold Polyurethane Foam throughout the United States.

13.     Defendant Valle Foam Industries, Inc. ("Valle") is a privately owned and operated corporation with its headquarters located at 4 West Dr., Brampton, ON L6T 2H7. During the Class Period, Valle sold Polyurethane Foam, either directly or through its affiliates, throughout the United States.

14.     Defendant Domfoam International, Inc. ("Domfoam") is a subsidiary of Valle Foam Industries, with its headquarters located at 8785 Langelier Blvd., Montreal, Quebec, H1P 2C.  Domfoam is a manufacturer/wholesaler of polyurethane foam.   During the Class Period, Domfoam sold Polyurethane Foam throughout the United States.

15.     Defendant The Carpenter Company ("Carpenter") is a privately owned and operated company with its headquarters located at 5016 Monument Avenue, Richmond, VA 23230. Carpenter is the largest manufacturer of Polyurethane Foam cushioning in the world, and operates from around 30 locations in the United States, 5 locations in Canada and 20 locations in Europe.  During the Class Period, Carpenter directly sold Polyurethane Foam throughout the United States.

16.     Defendant The Woodbridge Group ("Woodbridge") is a Canadian corporation with its headquarters located at 4240 Sherwoodtowne Blvd., Mississauga, ON L4Z 2G6. During the Class Period, Woodbridge directly sold Polyurethane Foam throughout the United States.

17.     Defendant Flexible Foam Products, Inc. ("Flexible Foam") is a privately owned and operated Ohio company with its headquarters located at 12575 Bailey Road, Spencerville,

OH 45887, and is a subsidiary of Ohio Decorative Products, Inc., of Spencerville, OH. During the Class Period, Flexible Foam directly sold Polyurethane Foam throughout the United States.

18.     Defendant Scottdel Inc. ("Scottdel") is a privately held corporation with its headquarters located at 400 Church Street, Swanton, OH 43558. During the Class Period, Scottdel directly sold Polyurethane Foam throughout the United States.

19.     Defendant Foamex Innovations, Inc., formerly known as Foamex International, Inc. ("Foamex"), is a privately owned and operated company with its headquarters located at Rose Tree Corporation Center II, 1400 N. Providence Road, Suite 2000, Media, PA 19063-2076. During the Class Period, Foamex sold Polyurethane Foam throughout the United States.

20.     Defendant Future Foam, Inc. ("Future Foam") is a privately owned and operated company with its headquarters located in 1610 Avenue N, Council Bluffs, IA 51501. During the Class Period, Foamex sold Polyurethane Foam throughout the United States.

21.     Defendant Vitafoam Products Canada Limited ("Vitafoam Canada") is a privately owned and operated company with its headquarters located at 150 Toro Road, North York, ON M3J 2A9. During the Class Period, Vitafoam sold Polyurethane Foam, either directly or through its affiliates, throughout the United States.

22.     Vitafoam Inc. ("Vitafoam U.S.") is a privately owned and operated company with its headquarters located at 2215 Shore Drive, High Point, NC 27263. During the Class Period, Vitafoam U.S. sold Polyurethane Foam, either directly or through its affiliates, throughout the United States. (Collectively, Vitafoam Canada and Vitafoam U.S. are referred to as "Vitafoam."). Vitafoam Canada and Vitafoam U.S. are owned by The Vita Group, formerly known as British Vita Group.

## CO-CONSPIRATORS AND AGENTS

23.     Other natural persons, corporations, and entities not named as Defendants herein, have participated in the unlawful conspiratorial activity alleged herein in violation of the antitrust laws of the United States.

24.     Whenever in this Complaint reference is made to a statement or transaction by any corporation or entity, the allegation means that the corporation or entity acted, stated, or transacted by or through its directors, members, partners, officers, employees, or agents, while they were engaged in the management, direction, control, or conduct of the corporation's or entity's business and acting within the scope of their authority.

## THE POLYURETHANE FOAM MARKET

25.     Polyurethane Foam is used to insulate objects or reduce shock.  It is used in bedding, packaging, seat cushioning, carpet cushioning, shipping pads and shipping cushioning, car interiors, fluid filtration systems, anti-noise and vibration systems in aircraft, and medical devices, as well as in a number of other industrial and consumer applications.

26.     Polyurethane Foam refers to different types of foam consisting of polymers made of molecular chains bound together by urethane links. It can be flexible or rigid, but generally has a low density.

27.     Flexible Polyurethane Foam is most often used in bedding and upholstery, while the more rigid variety is used for products' thermal insulation and in automobile dashboards.

28.     Microcellular foam may be used to make car steering wheels or line the insides of athletic helmets. Elastomeric foam is typically used to make the outer sole of many types of footwear, including athletic shoes.

7

29.     To manufacture foam for cushioning, two basic procedures are used. In one, the chemical mix is poured onto a moving conveyor, where it is allowed to react and expand. Sides on the conveyor allow the foam to rise into a "bun" or slab anywhere from two to four feet high. The continuous slab is then cut, stored, and allowed to cure for up to 24 hours. This manufacturing procedure is the "slabstock" production process. The cured foam is subsequently fabricated into useful shapes. Most foams for use in furniture and bedding are produced this way.

30.     A second method, foam molding, is a process where individual items are produced by pouring foam chemicals into specially shaped molds and allowing the foam reaction to take place. This process is used primarily for automotive cushioning (such as seats, armrests, and headrests), although some contract furniture utilizes molded cushions. This foam is sometimes referred to as "semi-flexible."

31.     Flexible foam is widely used for its qualities: it is lightweight, resilient, quiet, low odor and resistant to mildew and other triggers of common allergies. Flexible foam may also be molded and cut. More than 1.2 billion pounds of foam are produced and used every year in the U.S.

32.     Rigid Polyurethane Foam has many relevant applications in construction. Many odd and detailed shapes such as sculptures and domed ceilings are far easier to make with foam than with wood. Some manufacturers sell specialty rigid foam that is used to replace wood in carved signs and three-dimensional topography models. It is also used as home insulation, rigid boat hulls, tennis racket grips and surfboards.

33.     The relevant geographic market is at minimum the United States.  In 2010, domestic revenue for Polyurethane Foam industry is expected to be approximately $12 billion.

34.     Defendants alleged here to be participants in the conspiracy are most of the major

North American Polyurethane Foam producers representing a significant portion of the United

States market.

## Market Factors Which Created an Environment Conducive to Collusion

### Significant Barriers to Entry

35.     There are significant barriers to entry in the Polyurethane Foam market. Entry

requires, among other things, that a company incur significant start-up capital expenditures,

including those needed for manufacturing facilities, and significant investment in a distribution

network.

36.     Additionally, the industry has been consolidating rather than attracting new

entrants. Defendants have acquired smaller Polyurethane Foam manufacturers over the course of

the past decade.  For example:

(a) Defendant Carpenter acquired its European competitor, Dumo NV, in 2007;

(b) In 2006, Defendant Flexible Foam acquired one of Defendant Vitafoam U.S.'s
     facilities; and

(c) Also in 2006, Defendant Vitafoam U.S. sold another plant to Olympic Products LLC,
     which is a joint venture between Defendants Woodbridge and Hickory Springs.

### Inelastic Demand

37.     Demand for Polyurethane Foam is relatively inelastic. According to the

Polyurethane Foam Association ("PFA"), alternatives for Polyurethane Foam have "poor height

recovery characteristics after compression" and require additional insulation of springs.

9

38.     In addition, according to the PFA, Polyurethane Foam lacks an acceptable substitute with regard to factors including "economics, comfort potential, ease of use, and durability[.]"

39.     Polyurethane Foam from outside of the relevant geographic market does not serve as a substitute to North American Polyurethane Foam, since Polyurethane Foam is heavy and, therefore, expensive to ship across long distances.

### Standardized Product With High Degree of Interchangeability

40.     The PFA recognizes Polyurethane Foam as a commodity, which is interchangeable across manufacturers.

41.     When products offered by different suppliers are viewed as interchangeable by purchasers, it is easier for the suppliers to unlawfully agree on the price for the product in question, and it is easier to effectively monitor agreed-upon prices. This makes it easier to form and sustain an unlawful cartel.

### Opportunities to Conspire

42.     Defendants are members of several trade associations, including the PFA.

43.     Approximately 70% of U.S. Polyurethane Foam manufacturers are PFA members.

44.     Upon information and belief, Defendants used trade association meetings as opportunities to meet in person to allocate customers and coordinate price increases.

## THE CONSPIRACY

### Defendant Vitafoam's Admission of a Conspiracy

45.     Upon information and belief, in February 2010, Defendant Vitafoam voluntarily approached the U.S. Department of Justice, Antitrust Division, and reported evidence of illegal antitrust activities among itself and other companies and individuals in the industry ("competitors").  Vitafoam sought acceptance into the Antitrust Division's Corporate Leniency Program.  Since that time, Vitafoam and its employees have been cooperating with a DOJ investigation.  Upon information and belief, as a result of its application Vitafoam has received a conditional leniency letter from the DOJ.  This is significant because, in order to obtain such a letter, an applicant must admit its participation in a criminal antitrust violation of the Sherman Act.

46.     Under the DOJ Antitrust Division's Corporate Leniency Policy ("DOJ Corporate Leniency Policy"), an applicant for leniency "must admit its participation in a criminal antitrust violation involving price fixing, bid rigging, capacity restriction, or allocation of markets, customers, or sales or production volumes before it will receive a conditional leniency letter." Further, "A company that argues that an agreement to fix prices, rig bids, restrict capacity, or allocate markets might be inferred from its conduct but that cannot produce any employees who will admit that the company entered into such an agreement generally has not made a sufficient admission of criminal antitrust violation to be eligible for leniency. A company that, for whatever reason, is not able or willing to admit to its participation in a criminal antitrust conspiracy is not eligible for leniency." (Department of Justice, Frequently Asked Questions

Regarding the Antitrust Division's Leniency Program and Model Leniency Letters (Nov. 19, 2008), http://www.usdoj.gov/atr/public/criminal/239583.pdf).

47.     Given the fact that Defendant Vitafoam has been granted amnesty by the DOJ, and given the structure of the market for polyurethane foam as detailed above, CFC Plaintiffs aver, upon reasonable information and belief, that the Defendants engaged in a conspiracy to restrain trade.

48.     Plaintiffs further believe that Defendant Vitafoam's transmission of evidence in exchange for DOJ leniency led to government raids on the offices of Defendants.

### Defendant Carpenter is Raided

49.     On or before July 27, 2010, the FBI raided the office of Defendant Carpenter as part of a federal government probe into pricing practices related to Polyurethane Foam.

50.     Carpenter confirmed the investigation, saying: "In connection with a multi-jurisdiction investigation of the pricing practices to [sic] polyurethane foam products, the U.S. government has required that manufacturers of polyurethane foam, including Carpenter Co., produce information and documents. Carpenter Co. is being fully responsive and cooperative with the government to facilitate their review."

51.     To obtain search warrants, as it appears that the FBI did here with regard to Defendant Carpenter and other Defendants, the United States must demonstrate to a magistrate judge that it possesses probable cause, recounted in a sworn affidavit or testimony grounded on reasonably trustworthy information, that it would obtain evidence of an antitrust violation as a result of executing the search warrant. That is, the United States had to have evidence sufficient

12

to justify the belief in a person of reasonable caution that raiding the offices of a seemingly lawful business would uncover evidence of antitrust violation.

52.     On or about the same day of the FBI raids, the European Commission ("EC") raided the offices of several Polyurethane Foam manufacturers.  Carpenter confirmed that it was also a target of the EC raids.

53.     The FBI and EC raids, along with the DOJ amnesty granted to Defendant Vitafoam, support Plaintiffs' allegations of a conspiracy among Defendants to fix prices and allocate customers in the market for Polyurethane Foam.

<u>**The Nature of the Conspiracy to Fix Prices and Allocate Customers**</u>

54.     Upon information and belief, an understanding and agreement existed among the competitors in the foam industry to collectively support price increases.

55.     Upon information and belief, Defendants also agreed to avoid each other's customers and not attempt to take business or market share from one another.

56.     Upon information and belief, the participants in this conspiracy took steps to avoid detection of their conspiracy.

57.     Upon information and belief, Defendants also undertook efforts to police the conspiracy.

<u>**FRAUDULENT CONCEALMENT, EQUITABLE ESTOPPEL, TOLLING AND CONTINUING INJURY**</u>

58.     Defendants' and their co-conspirators' agreement, understanding and conspiracy in violation of the antitrust laws was fraudulently concealed.  As a result, Plaintiffs and the Class members were unaware of Defendants' unlawful conduct as alleged herein and did not know that

they were paying artificially high prices for Polyurethane Foam throughout the United States during the Class Period. Defendants and their co-conspirators affirmatively and fraudulently concealed their unlawful conduct. By its very nature, the conspiracy engaged in by Defendants and their co-conspirators was inherently self-concealing.

59.     Plaintiffs and the Class members did not discover, nor could they have discovered through reasonable diligence, that Defendants and their co-conspirators were violating the antitrust laws until shortly before this litigation was initially commenced, because Defendants and their co-conspirators used deceptive and secret methods to avoid detection and to affirmatively conceal their violations.

60.     Because of Defendants' and their co-conspirators' fraudulent concealment, Defendants are equitably stopped from asserting that the claims of Plaintiffs and the Class are time-barred by the applicable statute of limitations.

61.     The running of any applicable statute of limitations has been equitably tolled as to the claims of Plaintiffs and the Class as a result of Defendants' and their co-conspirators' fraudulent concealment.

62.     Each conspiratorial act of Defendants and their co-conspirators constitute injurious acts which restart the applicable statute of limitations.

14

## ANTITRUST INJURY

63.     The unlawful contract, combination and/or conspiracy alleged above had and is having, inter alia, the following effects:

> a.     Prices charged by Defendants and their co-conspirators to CFC Hiddenite and the members of the Class for Polyurethane Foam have been maintained at artificially high and supracompetitive levels;

> b.     CFC Hiddenite and members of the Class were required to pay more for Polyurethane Foam than they would have paid in a competitive marketplace in the absence of Defendants' and their co-conspirators' collusive and unlawful price-fixing; and

> c.     Plaintiffs and members of the Class have been deprived of the benefits of free, open and unrestricted competition in the market for Polyurethane Foam.

64.     During and the period of the contract, combination or conspiracy alleged above, CFC Hiddenite and members of the Class directly purchased Polyurethane Foam in the United States.

65.     CFC Hiddenite and the other Class members paid more for the Polyurethane Foam than they would have paid under conditions of free and open competition.

66.     As a direct and proximate result of the illegal combination, contract or conspiracy alleged above, CFC Hiddenite and the members of the Class were injured and financially damaged in their businesses and property, in amounts that are not presently determined.

15

67.     This is antitrust injury of the type that the federal laws were meant to prevent and punish.

## **CLASS ALLEGATIONS**

68.     Plaintiffs incorporate by reference as if fully set forth herein the allegations contained in the proceeding paragraphs of this Complaint.

69.     Plaintiffs bring this action on behalf of themselves, as sole shareholders of now-liquidated CFC Hiddenite,  and the members of the Class comprising:

> All persons or entities which purchased Polyurethane Foam directly from Defendants or their unnamed co-conspirators from January 1, 1999 to the present. Excluded from the Class are governmental entities, Defendants, their co-conspirators and their representatives, parents, subsidiaries and affiliates.

70.     Plaintiffs bring this action on their own behalf and as a class action under Rule 23(a), 23(b)(2) and 23 (b)(3) of the Federal Rules of Civil Procedure on behalf of all members of the Class.

71.     Due to the nature of the trade and commerce involved, Plaintiffs believe the Class numbers in the thousands, the exact number and identities being known only to Defendants.

72.     The Class is so numerous and geographically dispersed that joinder of all members is impracticable.

73.     Class members are identifiable from information and records in the possession of Defendants.

74.     There are questions of law and fact common to the Class.  These common questions relate to the existence of the conspiracy alleged, and to the type and common pattern of injury sustained as a result thereof.  The questions include but are not limited to:

16

a.  Whether Defendants and their co-conspirators engaged in a combination and conspiracy among themselves to fix, raise, maintain and/or stabilize the price charged for, or allocated customers for, Polyurethane Foam sold in the United States;

b.  The identity of participants in the conspiracy;

c.  The duration of the conspiracy alleged in this complaint and the nature and character of the acts performed by Defendants and their co-conspirators in the furtherance of the conspiracy;

d.  Whether the alleged conspiracy violated Section 1 of the Sherman Act;

e.  Whether the conduct of Defendants and their co-conspirators, as alleged in this complaint, caused injury to the business and property of Plaintiff and other members of the Class;

f.  The effect of Defendants' conspiracy on the prices of Polyurethane Foam in the United States during the Class Period; and

g.  The appropriate measure of damages sustained by Plaintiff and other members of the Class.

75.  Plaintiffs are members of the Class by virtue of their succession to all claims of the now-liquidated CFC Hiddenite. Plaintiffs' claims are typical of the claims of other members of the Class, and Plaintiffs will fairly and adequately protect the interests of the members of the Class. CFC Hiddenite bought Polyurethane Foam directly from one or more of Defendants. Plaintiffs' interests are aligned with, and not antagonistic to, those of the other members of the

17

Class.  In addition, Plaintiffs are represented by competent counsel experienced in the prosecution of class action antitrust litigation.

76.    The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

77.    The questions of law and fact common to the members of the Class predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

78.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Prosecution as a class action will eliminate the possibility of repetitious litigation.  Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently and without the duplication of effort and expense that numerous individual actions would engender. Class treatment will also permit the adjudication of relatively small claims by members of the Class who otherwise could not afford to litigate and antitrust claim such as is asserted in this Complaint.  This class action presents no difficulties of management that would preclude its maintenance as a class action.

## INTERSTATE TRADE AND COMMERCE

79.     The conduct of Defendants and their co-conspirators has taken place in, and affected the continuous flow of interstate trade and commerce of, the United States in that, inter alia:

a.      Defendants and their co-conspirators have sold Polyurethane Foam throughout the United States;

b.      Defendants and their co-conspirators have each used instrumentalities of interstate commerce to sell Polyurethane Foam throughout the United States;

c.      In furtherance of the conspiracy alleged herein, Defendants have traveled between the States and have exchanged communications through interstate wire communications and via U.S. mail; and

d.      The conspiracy alleged herein has affected billions of dollars of commerce.  Defendants and their co-conspirators have inflicted antitrust injury by artificially raising prices paid by Plaintiff and other Class members who are themselves engaged in commerce.

## CLAIM FOR RELIEF

### For Violation of Section 1 of the Sherman Act and Section 4 of the Clayton Act

80.     Plaintiffs re-allege and incorporate each and every allegation set forth above as if fully written herein.

81.     From a date unknown, but beginning at least as early as 1999 and continuing through the present, Defendants and their co-conspirators have combined, conspired and/or

contracted to restrain interstate trade in violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and Section 4 of the Clayton Act, 15 U.S.C. § 15.

82.     In furtherance of the unlawful conspiracy, each of Defendants and their co-conspirators has committed overt acts, including, inter alia:

    a.     agreeing to charge prices at certain levels and otherwise to fix, increase, maintain and/or stabilize prices of Polyurethane Foam sold in the United States;

    b.     communicating with co-conspirators regarding prices to be charged for Polyurethane Foam;

    c.     agreeing to allocate customers;

    d.     meeting with co-conspirators in order to keep the existence of the conspiracy unknown so as to foster the illegal anti-competitive conduct described herein; and

    e.     refraining from competing by refusing to offer Polyurethane Foam at prices below the agreed-upon fixed price.

83.     Defendants and their co-conspirators engaged in the activities described above for the purpose of effectuating unlawful arrangements to fix, maintain, raise and/or stabilize prices of Polyurethane Foam.

84.     Plaintiffs and the members of the Class, therefore, have been injured and financially damaged in their respective businesses and property in an amount to be determined according to proof and are entitled to recover threefold the damages sustained pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15.

85.     The conduct of Defendants and their co-conspirators constitutes a per se violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

## PETITION FOR RELIEF

WHEREFORE, Plaintiffs petition that:

A.      The Court determine that this action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, that Plaintiffs be appointed class representatives and that Plaintiffs' counsel be appointed as counsel for the Class.

B.      The contract, combination or conspiracy, and the acts done in furtherance thereof by Defendants and their co-conspirators, be adjudged to have been in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

C.      Judgment be entered for Plaintiffs and members of the Class against Defendants, jointly and severally, for three times the amount of damages sustained by Plaintiffs and the Class as allowed by law, together with the costs of the action, including reasonable attorneys' fees, and pre- and post-judgment interest.

D.      Defendants, their affiliates, successors, transferees, assignees, and the officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf, be permanently enjoined and restrained from, in any manner:

a.      Continuing, maintaining or renewing the contract, combination or conspiracy alleged herein, or from engaging in any other contract, combination or conspiracy having similar purpose or effect, and from adopting or following any practice, plan, program or device having a similar purpose or effect; and

21

       b.     Communicating or causing to be communicated to any other person engaged in manufacture, distribution or sale of Polyurethane Foam except to the extent necessary in connection with a bona fide sales transaction between the parties to such communications.

   E.    Plaintiffs and members of the Class have such other, further and different relief as the case may require and the Court may deem just and proper under the circumstances.

## JURY DEMAND

Pursuant to Rule 38(a) of the Federal Rules of Civil Procedure, Plaintiffs demands a jury trial of all issues triable by jury.

Dated: August 26, 2010             Respectfully submitted,

/s/ Robert C. Cone
Robert C. Cone
N. C. State Bar No. 8228
**TUGGLE DUGGINS & MESCHAN, P.A.**
P. O. Drawer 2888
Greensboro, NC 27402-2888
Telephone: 336-271-5230
Fax: 336-274-6590
rcone@tuggleduggins.com


Steven A. Asher
Mindee J. Reuben
Jeremy S. Spiegel
**WEINSTEIN KITCHENOFF & ASHER LLC**
1845 Walnut Street, Suite 1100
Philadelphia, PA 19103
Telephone: 215- 545-7200
Fax: 215-545-6536
asher@wka-law.com
reuben@wka-law.com
spiegel@wka-law.com

Counsel for Plaintiffs and the Proposed Class